**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**

**CIVIL ACTION NO. 4:20-CV-00159-JHM**

**HUMAN RIGHTS DEFENSE CENTER**                                            **PLAINTIFF**

**V.**

**HENDERSON COUNTY, et al.**                                                   **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter is before the Court on cross-motions for summary judgment by Defendants Henderson County, Kentucky, Amy Brady, and Lironda Hunt [DN 64] and Plaintiff Human Rights Defense Center [DN 68].  Fully briefed, this matter is ripe for decision.

**I. BACKGROUND**

Plaintiff Human Rights Defense Center ("HRDC"), a publisher of materials for prisoners, sues Defendants Henderson County, Jailer Amy Brady, and Mail Intake Clerk Lironda Hunt ("Defendants") over the mail policies and practices at the Henderson County Detention Center ("Detention Center").

**A. Human Rights Defense Center**

HRDC is a nonprofit organization that does "public education, advocacy, and outreach" on behalf of incarcerated persons who seek legal redress for infringements of their constitutional rights.  [Complaint, DN 1 at ¶ 7; DN 68 at 3].  HRDC publishes and distributes books, magazines, and other literature about jails, prisons, and the rights of incarcerated persons.  [*Id*.].  HRDC's materials and information are in printed format, not digital.  Among HRDC's materials is *Prison Legal News: Dedicated to Protecting Human Rights*, a monthly magazine containing news and analysis about prisons, prison conditions, court opinions, and other matters relevant to the rights

of incarcerated persons. [*Id.*]. Another is *Criminal Legal News*, a similar publication covering criminal justice issues. [*Id.* at 3–4.]. Additionally, HRDC publishes and distributes dozens of books on similar subjects, such as *Prisoners' Guerilla Handbook: A Guide to Correspondence Programs in the United States and Canada* and *Protecting Your Health and Safety*, a book which describes prisoners' rights and legal remedies. [*Id.* at 4–5.]. HRDC also sends informational brochures, which contains a subscription order form for prisoners who wish to subscribe to HRDC's materials, and copies of judicial opinions relevant to prisoners. [*Id.* at 5.]. HRDC delivers these materials through the United States Postal Service. Each is addressed to a specific person and postage is fully paid. [Wright Decl. at ¶9, DN 69].

**B.  HRDC Mail Rejected**

Between June 2020 and September 2020, HRDC sent unsolicited mailings and publication materials to ten inmates at the Detention Center. [DN 1 at ¶¶ 24-25]. HRDC staff identified these inmates "as people likely to need the information contained in the publications HRDC distributes . . ." [DN 64-2]. HRDC alleges that during this time at least 89 items sent by HRDC were "censored" by Defendants including: (1) copies of the court case *Clement v. California*, 364 F.3d 1148 (9th Cir. 2004); (2) copies of monthly issues of *Prison Legal News*; (3) copies of monthly issues of *Criminal Legal News*; (4) copies of the book *Prisoner's Guerilla Handbook*; (5) copies of the book *Protecting Your Health and Safety: A Litigation Guide for Inmates*; (6) copies of an informational brochure packet; and (7) ten follow-up letters. *See* [DN 64-1 at 8–9 and related exhibits; DN 68 at 8–10]. The *Prison Legal News* and the *Criminal Legal News* were bound by staples. Similarly, the case and the informational brochure packet also contained staples.

Mail Clerk Hunt testified that the Detention Center directed these mailings to be returned to HRDC as most of the items contained staples and the books were sent by HRDC without

preapproval from the Detention Center pursuant to the mail policy.  [Hunt Aff. at DN ¶6, DN 15-2].  Jailer Brady testified that the ten follow-up letters were returned to HRDC staff under the mistaken belief "that the information contained in the envelopes were available in the law library on the inmate's tablets."  [Brady Aff. at ¶¶ 20-21, DN 64-4].  All returned copies, with the exception of the copies of the two books, were marked "return to sender per mail policy."  The returned copies of the two books sent were marked "return to sender: refused: unable to forward." [DN 69-4].

## C.  § 1983 Action

On September 21, 2020, HRDC filed a complaint against Defendants pursuant to 42 U.S.C. § 1983 seeking compensatory damages and declaratory and injunctive relief alleging Defendants' actions constituted an infringement of HRDC's First Amendment rights to communicate with incarcerated persons at the Detention Center through the United States mail and violated HRDC's Fourteenth Amendment right to notice and due process by allegedly failing to give HRDC sufficient notice of its alleged censorship and right to appeal.  [DN 1, DN 5].

Defendants now move for summary judgment arguing that the Detention Center did not infringe on HRDC's First or Fourteenth Amendment rights and that the issue was moot anyway given the Detention Center's change in its mail policy.  HRDC followed with its own motion for summary judgment arguing it was still owed compensatory damages.  HRDC also renewed its request for a permanent injunction (1) prohibiting Defendants from refusing to allow persons incarcerated at the Detention Center from physically possessing HRDC's publications in their cells or rejecting its magazines only because they contain staples; and (2) requiring Defendants to provide timely notice to HRDC and other publishers each time a publication is rejected, the specific reasons for the rejection, and how that rejection can be appealed.  [DN 68 at 2].

## D.  Henderson County Detention Center's Mail Policy

### 1.  June 2020 to September 20, 2020 Mail Policy or Practice

Between June 2020 and September 2020, the Detention Center had an old, unused written mail policy[1] (hereinafter "former written mail policy") and a currently used mail practice (hereinafter "mail practice") that incorporated some of the former written mail policy with some new practices instituted by the new jailer, Amy Brady.   In fact, at the time of the alleged

---

[1] The Detention Center's former written mail policy for persons incarcerated at the detention center was posted on the public website for the Detention Center.  The former mail policy provides in relevant part:

Mail Procedure:

1. Any inmate may correspond with anyone outside the detention center, so long as each letter or parcel bears the proper postage; except when the parcel or postage poses a threat to the security of the facility. . . .

2.  All letters addressed to inmates may be opened and inspected by a detention officer for search of contraband or materials & information that threatens the security of the facility. . . .

3. All parcels will be accepted within the 1st seven (7) days of incarceration and upon approval of the property officer for intake and processing.  All parcels not meeting these criteria will be returned to sender.

4. All items within a parcel will be visually inspected for contraband items and authorization within the facility. Excess and unauthorized items are turned over to the property officer.

. . .

Censorship Guidelines:

The following shall [sic] items shall not be allowed through the mail or permitted in the inmate's possession or in the living quarters and shall be confiscated as censored materials.

1. Items portraying types of sexual acts to include photographs or explicit drawings of nude persons whose sexual organs are exposed; or Descriptive text describing sexual acts.

2. Postage stamps, envelopes, blank paper, blank cards, stationary

3. Pens, pencils, markers, crayons

4. Colored envelopes

5. Clothing

6. Personal checks

7. Polaroid pictures or photo copied photos

8. Photographs or Cards larger than 5x7

9. Audio or video tapes, cds or dvds not legal in nature

10. Pop up cards, homemade cards, stickers, items containing glitter

11. Printed material

12. Jewelry

13. Books, magazines or publication including Newspapers and Newspaper clippings

14. Gang related material (gang signs/wirting) [sic]

15. Coloring pages or drawings

16. Items deemed inappropriate by staff

17. Illustrations and/or text which show or describe the manufacture or fabrication of weapons such as guns, bombs, incendiary devices, etc.

18. Other items which can categorically be expected to encourage violent or disruptive behavior by the particular inmate or among the inmates generally.

Note: A review committee consisting of a member of the inmate service branch and the Guard commander shall approve/disapprove all questionable materials.  [DN 15-8].

constitutional violations, the Detention Center was in the process of revamping its written mail policy and transitioning to electronic mail distribution.  [Brady Dep. at 23–27, 38, DN 70-2].  Jailer Brady testified that between June 2020 and September 2020, the Detention Center was no longer adhering to all of the Censorship Guidelines contained in the former written mail policy.  [*Id*.].  For example, during this time period, the Detention Center permitted paper, pencils, and books in the inmates' cells.  *See, e.g.* [Blackwell Dep. at 62, DN 84; Cates Dep. at 84, DN 83; Benson Dep. at 19–20, DN 83-1].  Upon implementing the mail practice, the Detention Center posted a window clinger to inform the inmates of the property policy changes regarding what could be stored within an assigned bunk area, including the number of books permitted, letter writing materials, clothing, and commissary items.  [DN 93-1].

Under the mail practice, all incoming mail could be opened and inspected by a Detention Center officer for contraband or materials that threatened the security of the facility.  [DN 15-8].  When items were censored or rejected because they contained threatening items, the Detention Center notified the inmate set to receive the items and returned the mail to the sender.  [Brady Dep. at 23–27, 38, DN 70-2].  Additionally, the mail practice required preapproval of all parcels and books prior to delivery to inmates.  [McElfresh Dep. at 66, DN 71-3].  To preapprove parcels and books, senders were required to submit a form to or otherwise request approval from the Chief of Inmate Service Branch.  [*Id*.]  If a parcel or book was not preapproved, the Detention Center returned it to the sender.  [*Id*. at 69].

Under the mail practice, the Detention Center considered staples contraband.  [Brady Aff., DN 15-1; Hunt Aff., DN 15-2].  Some inmates occasionally use staples as a heat source to light cigarettes, fasten to the end of pencils to use as a weapon, and to inflict harm on themselves and others, among other uses.  [Brady Aff., DN 15-1].  Consequently, the Detention Center treated all

5

mail containing staples as contraband—irrespective of the content, the sender, or the type of mailing. [*Id.*].

2. *New Written Mail Policy and Electronic Distribution of Mail*

On September 21, 2020, the Detention Center implemented a new written mail policy. [DN 93-2]. Specifically, the record reflects that on July 28, 2020, the Detention Center entered into a contract with Aramark to provide inmate mail services via electronic means. The mail scanning went into effect on September 21, 2020. Since that time, the Detention Center now permits mailed publications, letters, and other reading material to be scanned to an electronic tablet that each prisoner has access to in his or her cell. [DN 15; DN 64-1 at 31–33]. The current written mail policy specifically provides that mail in the form of newsletters should be "provided to the inmate services branch in digital format for review and approval. Upon approval, newsletters may be viewed through the personal tablet account." [DN 93-2 at 5]. It also provides that parcels, including those parcels containing books, "shall be requested in writing and require preapproval by the Jailer or Chief Deputy of Investigations or inmate prior to acceptance by [the Detention Center]." [DN 93-2 at 9]. Under this policy, inmates are required to sign and date a form or mail log accepting or refusing mail. [DN 86-2; DN 93-2].

Specifically, with respect to HRDC publications bound with staples and too large to scan, those mailings accepted by the inmates are placed in the inmate's personal property and are accessible by the inmate when he requests to review them. [Brady Aff. at ¶¶ 13–15, DN 64-4]. Upon request, inmates are taken to a private room in the Detention Center and allowed to view the documentation in their property. Prior to returning an inmate to his or her cell, staff ensure that all staples remain in the publications. [DN 64-4]. *See also* [Blackwell Dep. at 23, 83, DN 84; Benson Dep. at 9, 15, 16, 22, DN 83-1; Ervin Dep. at 9–10, DN 84-3; Johnson Dep. at 5–6, 28, DN 72;

McGuire Dep. at 5–6, 9–10, 11, 22, 29, 38–40, DN 83-4].  With respect to books, if the book is preapproved by the Detention Center, inmates can request to have it in their cell so long as they do not have five books in their cell already or they exchange a book in their cell for one in their property bag.  [DN 81 at 4; DN 64-4; Hunt Dep. at 18, DN 72-4].  While the Detention Center has updated the written mail policy [DN 93-2], the Inmate Rules, Policies, and Procedures contained on the inmate's tablet has not yet been updated to reflect this change.  *See* [DN 108-1 at 19, 21–23].

### E.  Inmate Testimony

The parties extensively cite to the testimony of inmates at the Detention Center.  In an effort to understand the parties' arguments and the Court's decision, the Court summarizes the testimony of the inmates deposed below.

### 1.  Two Original Inmates

Two of the original ten inmates to which HRDC initially mailed unsolicited books and magazines testified via deposition.  Joshua Blackwell was incarcerated at the Detention Center from December 2019 to June 2021.  [Blackwell Dep. at 9, DN 84].  Blackwell testified that prisoners were not allowed to have any books other than their Bible which he stated was clearly expressed in the inmate handbook.  [*Id*. at 15, 64].  He testified that he was not aware that inmates were allowed to possess five books in their cell at one time [*id*. at 19] and that he did not observe any clingers on the walls reflecting a change in what the inmates could have in their cells [*id*. at 62].  However, Blackwell acknowledged that other inmates in his cell possessed multiple books, including the Bible, drug treatment program books, GED, and leadership books.  [*Id*.].  Blackwell conceded that after the implementation of the new written mail policy, publications containing staples such as magazines were placed in his personal property outside of his cell.  [*Id*. at 21–23].

7

He further testified that he understood he could submit a request form to access his personal property, but he never chose to utilize the process to view any materials sent to him by HRDC. [*Id*. at 23, 83]. Blackwell also confirmed that he received some scanned items, including *Criminal Legal News* and *Prison Legal News*, on the tablet during the fall of 2020. [*Id*. at 57]. He testified that he was unable to read the print of one of the magazines, he "wrote grievances about that," and Detention Center Captain Megan McElfresh attempted to rescan it on two occasions. [*Id*. at 57–58].

Japaris Baker was incarcerated at the Detention Center from July 17, 2019, to at least November 1, 2021, at the time he testified via deposition. [DN 83-2, Baker Dep. at 10]. He testified that he did not think prisoners could order books [*id*. at 14], and he never possessed in his cell any of the mailings from HRDC [*id*. at 28–29]. He also attested that he never observed any of the clingers on the cell windows. [*Id*. at 49]. He further testified that he never subscribed to any HRDC publications or books, but received them for free. [*Id*. at 50]. Baker explained that he learned in October of 2021 from Mail Clerk Hunt that he "could get pulled out to see" a book or magazine located in his property. [*Id*. at 31, 35, 40]. Baker testified that as of November 1, 2021, he had five books in his cell. [*Id*. at 48–49]. Baker confirmed that he received a copy of the July 8, 2020, follow-up letter from HRDC. [*Id*. at 28].

*2. Other Inmates*

The other inmates that testified via deposition did not receive HRDC's mailings prior to the Detention Center's new written mail policy. With the exception of the testimony regarding the window clinger, these inmate's testimony relates primarily to the Defendant's conduct after the implementation of the new written mail policy on September 21, 2020.

Austin Cates was incarcerated at the Detention Center from December 25, 2019 until November 1, 2021. [Cates Dep. at 11, DN 83]. Cates testified that Mail Clerk Hunt informed him that HRDC sent him booklets, pamphlets, and publications and that this material was placed in his property because they contained staples or were too large to scan. [*Id*. at 16, 51–54]. Cates further testified that he was informed that he could access the publications in his property "once I got out or once I moved to another jail or whatever." [*Id*. at 57]. Cates acknowledged that he accessed his "legal forms, [his] 1983 suits and stuff like that" from his property bag outside his cell. [*Id*. at 66]. Yet, despite being aware that HRDC publications had been placed in his personal property, Cates never asked Hunt or other members of the Detention Center staff to see the materials HRDC sent to him nor filed a property requisition form to view them. [*Id*. at 53–54, 111]. He testified that he is "sure there's somebody that has" used the property requisition form to review HRDC materials, but he did not. [*Id.* at 70]. With respect to books, Cates acknowledged the policy was inmates could have a Bible and three softcover books [*id*. at 84] but stated he was not aware of any inmate possessing a magazine or non-religious book in their cell [*id*. at 41]. Cates never requested to have another type of book in his cell. [*Id*. at 73]. Similarly, he testified that he observed the Detention Center cell window clinger advising inmates that they were allowed to possess multiple books on one occasion. [*Id*. at 71]. Cates also stated that some HRDC letters were scanned to his table account. [*Id*. at 48].

Brett Benson was incarcerated at the Detention Center from September 26, 2019, to at least January 5, 2022, the date of his deposition. Benson testified that he was aware that inmates were allowed to possess five books in their cell at one time. [Benson Dep. at 19–20, DN 83-1]. Benson also testified that HRDC had sent him unsolicited materials, that the Detention Center staff had told him he had been mailed materials, the materials were placed in his personal property, and that

he was aware that he could access HRDC materials in his personal property and read it outside his cell area.  [*Id*. at 9, 15, 16, 22].  He stated that he never requested to read the HRDC materials outside his cell.  [*Id*. at 33–34].  He further indicated that he received scanned copies of letters from HRDC.  [*Id*. at 23].  Inconsistent with his previous testimony, Benson also testified that there was no way to obtain a book except one donated through the chaplain.  [*Id*. at 27].

Matthew Ervin was incarcerated at the Detention Center from November 9, 2020 to at least January 5, 2022, the date of his deposition.  [Ervin Dep. at 34, DN 84-3].  Ervin had been incarcerated at the Detention Center several times since 2014.  Ervin testified that he was aware that HRDC mailed him unsolicited materials and publications, that the materials and publications were placed in his personal property bag outside the cell, and that he could access it with a property requisition form.  [*Id*. at 9–10].  He also stated that he asked to have the HRDC material in his cell but was informed that it could not come into cell and would be placed in property.  [*Id*.  at 12].  Mail Clerk Hunt also informed Ervin that if he submitted a requisition form, he could be placed in a special room to read a book or publication that HRDC sent.  [*Id*. at 38].  However, Ervin testified that he never requested to access his personal property outside of his cell or to exchange books within his cell with books within his personal property outside of his cell.  [*Id.* at 7–10].  Finally, Ervin stated that he saw the wall clinger advising him that he was allowed to possess multiple books in his cell.  [*Id*. at 13].

Isaiah Johnson was incarcerated at the Detention Center from May 27, 2021, to at least January 5, 2022, the date of his deposition.  [Johnson Dep. at 16, DN 72].  Johnson testified that inmates at the Detention Center were allowed to possess five books in their cell at one time.  [*Id*. at 7–8, 19].  He indicated that he believed those books to include only a Bible, other religious books, educational books, and GED books.  [*Id*. at 14–15].  Johnson conceded that he had never

tried to order a non-religious book or magazine for his cell. [*Id*. at 20]. Johnson also testified that he was informed by Mail Clerk Hunt that inmates can submit a request form to access their personal property located outside of their cell and the staff would place the inmates in a different room to view the publications. [*Id*. at 5–6, 28]. Johnson utilized the property requisition form to access a publication sent to him by HRDC in October of 2021. [*Id*. at 6–7]. On another occasion, Mail Clerk Hunt called him to the front to look at a book or publication he received from HRDC, but he declined to read it. [*Id*. at 13–14, 23, 29]. Johnson testified that he saw the wall clinger advising him that he was allowed to possess multiple books in his cell. [*Id*. at 33]. He stated, however, that it had been a long time since he saw it. [*Id*. at 24, 33, 37].

Lovechild McGuire was released from the Detention Center in January of 2021 and was reincarcerated on September 27, 2021. [McGuire Dep. at 24–25, DN 83-4]. McGuire testified that he was only aware of inmates being able to have Bibles in their cells. [*Id.* at 7]. McGuire further testified that he was aware that HRDC sent him unsolicited mailings and other material and that he could submit a request form to access his personal property bag outside of his cell. [*Id*. at 5–6, 9–10, 11, 22, 29, 38–40]. He stated that he spoke with Mail Clerk Hunt about the material HRDC sent him and asked to have those materials in his cell, but he was informed that he could not have them in his cell. Instead, "[s]he'd pull me out and she'd let me read them, I put a requisition in." [*Id*. at 40].

Mardale Hinton was incarcerated at the Detention Center from October 2019 to March 2021. [Hinton Dep. at 7, DN 83-3]. Hinton testified that in December of 2020 he sent a postcard to HRDC requesting to receive *Prison Legal News* and *Criminal Legal News*. [*Id*. at 26–27]. The Mail Log and Notification Forms reflect that Hinton received publications from HRDC on February 11, 2021 and March 22, 2021. [*Id*. at 16]. Hinton testified that HRDC mailed his various

11

publications, but he never utilized the prison requisition system to review the materials. [*Id*. at 16–17, 19, 33–34, 36]. Hinton further testified that inmates were allowed to only have Bibles in their cells, no other books were permitted. [*Id*. at 47].

## II. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

## III. DISCUSSION

### A. First Amendment

HRDC challenges the constitutionality of the former written mail policy or mail practice

in effect prior to September 20, 2020, as well as the new written mail policy implemented after that date.  In an effort to address both HRDC's claims for compensatory damages and injunctive relief, the Court must address all of the policies referenced by the parties.

"[P]ublishers who wish to communicate with those who . . . willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989).  "However, the Sixth Circuit has also explained that prisoners' right to receive mail is 'subject to restriction in the interests of prison security' as long as the restrictions 'further legitimate penological objectives, in a manner no more restrictive than necessary.'" *Hum. Rts. Def. Ctr. v. Washington*, No. 1:19-CV-12470, 2021 WL 2895192, at *6 (E.D. Mich. July 9, 2021) (quoting *Brooks v. Seiter*, 779 F.2d 1177, 1180 (6th Cir. 1985)).  "This standard applies to both prisoners and third parties trying to contact prisoners." *Washington*, 2021 WL 2895192, *6 (citing *Thornburgh*, 490 U.S. at 404.).

To determine whether a jail policy infringes on the First Amendment rights of inmates or those seeking to communicate with them, the policy "is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).  The United States Supreme Court in *Turner* identified four factors to aid in the determination whether the policy is "reasonably related to legitimate penological interests": "(1) whether there is a valid, rational connection between the prison policy and the legitimate governmental interest asserted to justify it; (2) the existence of alternative means for inmates [and third parties] to exercise their constitutional rights; (3) the impact that accommodation of these constitutional rights may have on other guards and inmates, and on the allocation of prison resources; and (4) the absence of ready alternatives as evidence of the reasonableness of the regulation." *Cornwell v. Dahlberg*, 963 F.2d 912, 917 (6th Cir. 1992) (citing *Turner*, 482 U.S. at 89–91); *see also Harbin-Bey v. Rutter*, 420 F.3d 571, 578

(6th Cir. 2005). "If the restriction or practice [is] reasonably related to legitimate prison concerns, there is no violation of the First Amendment." *Washington*, 2021 WL 2895192, at \*6. Courts are to give "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). *See also Hum. Rts. Def. Ctr. v. Baxter Cnty. Arkansas*, 999 F.3d 1160, 1164 (8th Cir. 2021). The Court applies these factors to the present case to determine whether the Detention Center's mail practice[2] or current written mail policy unconstitutionally restricts the publisher's First Amendment rights.

### 1. Mail Containing Staples

The first *Turner* factor requires a "'valid, rational connection' between the prison policy and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89 (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)). "Moreover, the governmental objective must be a legitimate and neutral one." *Id*. at 90. A valid and rational connection exists between the Detention Center's mail practice and new written mail policy rejecting mailings with staples (hereinafter "staple policy") and the legitimate, neutral governmental interests of jail safety and

---

[2] HRDC contends that during the summer of 2020, the Detention Center had a facially unconstitutional **written** policy of prohibiting incarcerated persons from receiving books, magazines, and other publications through the mail and that policy was the actual reason for the Detention Center's initial censorship. *See, supra,* note 1; DN 15-8). HRDC argues that the absence of staples in many items rejected by the Detention Center contradicts its explanation that staples were the reason for the rejections. HRDC contends that this explanation is merely a *post hac* rationalization. [DN 68 at 17–18].

With the exception of certain portions of the former written mail policy, HRDC cites no evidence—only speculation—that Defendants rejected HRDC's magazines or other publications for any other reasons than staples. Jailer Brady testified that the Detention Center was in the process of changing its written jail policy and that her staff rejected the publications because the publications contained staples. [Brady Dep. at 23–27, 38, DN 70-2]. The only remaining items that did not contain staples were the books and follow-up letters which the Court addresses below. Additionally, Defendants provided specific examples where staples threatened jail policy and security specifically at the Detention Center. Contrary to HRDC's argument, Defendants' actions and conduct in this litigation do not suggest a delay in stating on the record why HRDC's mailing were rejected. Significantly, six weeks after the case was filed, Defendants offered the staple explanation as the reason for the rejection of these publications in response to HRDC's motion for a preliminary injunction.

security. The staple policy has a legitimate goal: safety. "[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Pell v. Procunier*, 417 U.S. 817, 823 (1974).

Courts within the Sixth Circuit recognize that mailings with staples threaten prison security and safety because inmates may use staples as weapons or as tattoo guns. "Checking for contraband is a legitimate penological issue." *Helm v. Allen*, No. 3:18-CV-P90, 2020 WL 1172707, at *4 (W.D. Ky. Mar. 11, 2020) (citing *Bell v. Wolfish*, 441 U.S. 520, 550-51 (1979) (upholding regulation prohibiting hardback books because, inter alia, "hardback books are especially serviceable for smuggling contraband into an institution")); *Garraway v. Lappin*, No. 4:CV-10-1697, 2012 WL 959422, at *12 (M.D. Pa. Mar. 21, 2012) ("[A] prison policy which would screen incoming publications for contraband is clearly a legitimate one, meant to serve the purpose of reducing prison contraband."). Additionally, Defendants proffered examples of safety and security breaches caused by inmates with staples at the Detention Center. Specifically, inmates have used staples for tattooing inmates, as a component part in ignitors, to harm other inmates, and for self-inflicted harm. [Brady Aff. at ¶5, DN 15-1; Incident Reports, DN 15-3, DN 15-4, DN 15-5, DN 15-6, DN 15-7].

Both the previous mail practice and new written mail policy are also neutral. The Detention Center returned all mailings containing staples to the sender. Chaplain Kenny Noblett testified that he must also remove staples from all religious publications he distributes to inmates incarcerated at the Detention Center. [Noblett Dep. at 39]. Currently, the Detention Center either scans all HRDC mail with staples or, if it is too large, places it in the inmate's property where the inmate can submit a property requisition form to review the material. [Brady Aff. at ¶¶ 13-15, DN

15

64-4].  Thus, the need to keep contraband from inmates provides a rational connection between the restriction on mail containing staples and the Detention Center's goal of ensuring safety.

The second *Turner* factor "is whether there are alternative means of exercising the right that remain open to prison inmates [and third parties]." *Turner*, 482 U.S. at 89.  HRDC has several alternative means of disseminating their message to inmates. *Jones v. Campbell*, 23 F. App'x 458, 463 (6th Cir. 2001); *see also Brunson v. Verhelst*, No. C18-0030, 2018 WL 6069971, at *4 (W.D. Wash. Oct. 23, 2018), report and recommendation adopted, No. C18-0030-MJP, 2018 WL 6068426 (W.D. Wash. Nov. 20, 2018).  As noted by the United States Supreme Court, "[a]lternatives . . . need not be ideal, however; they need only be available." *Overton*, 539 U.S. at 136 ("*Turner* does not impose a least-restrictive-alternative test, but asks instead whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal.").  "Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation." *Turner*, 482 U.S. at 90 (internal quotation marks, citations, and alterations omitted).

Under the former mail practice, HRDC could have sent its publications without staples. Additionally, employees, agents, and representatives of HRDC could have contacted the ten inmates through an in-person visit, a video conference, a telephone call, or an email.  HRDC acknowledges that it has spoken to many Detention Center inmates by telephone.  [DN 64-21]. HRDC contends that it cannot effectively communicate its written speech to incarcerated persons by telephone or in-person visits in each of the over 5,000 prisons and jails in America or remove staples from all of its publications.  [DN 68 at 19].  However, in the present case, HRDC sought

to reach out to *ten* inmates at the Detention Center.  As stated above, "[a]lternatives . . . need not be ideal, however; they need only be available." *Overton*, 539 U.S. at 135.

Following implementation of its new policy in September 2020, it is undisputed that now HRDC can send its publications in digital format for approval which will then be downloaded to the applicable inmate's account.  [McElfresh Dep. at 158–159, DN 71-3; Hunt Dep. at 72, DN 72-4].[3]  In fact, that is the required procedure.  [DN 93-2]  Further, rather than sending HRDC publications back to HRDC that contain staples and are too large to scan, the Detention Center began placing all the publications in the relevant prisoner's property bag.  Upon request, inmates are taken to a private room in the Detention Center and allowed to view the documentation in their property.  Prior to returning an inmate to his or her cell, staff ensure that all staples remain in the publications.  [DN 64-4].  *See also* [Blackwell Dep. at 23, 83, DN 84; Benson Dep. at 9, 15, 16, 22, DN 83-1; Ervin Dep. at 9–10, DN 84-3; Johnson Dep. at 5–6, 28, DN 72; McGuire Dep. at 5–6, 9–10, 11, 22, 29, 38–40, DN 83-4].

These alternatives are or were readily available to HRDC, and as a result, the Court owes judicial deference to Defendants on this point.  *Turner*, 482 U.S. at 90.  Thus, the second factor of *Turner* supports Defendants.  *Overton*, 539 U.S. at 136; *Wisniewski v. Mueller*, No. 2:12-CV-1230, 2013 WL 625365, at *6 (D.S.C. Jan. 2, 2013).  *But see Hum. Rts. Def. Ctr. v. Sw. Virginia Reg'l Jail Auth.*, 396 F. Supp. 3d 607 (W.D. Va. 2019).

The third *Turner* factor looks at the impact the "accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources

---

[3] HRDC complains that while Jailer Brady testified that mail sent to the offsite scanning facility would be scanned and made available to incarcerated persons to read on their tablets, the mail scanning facility scanned only the front and back of the HRDC's magazines mailed there.  [DN 68 at 11].  Again, the new written mail policy requires such items to be sent in a digital format for preapproval.  Once approved, those items would be uploaded to the inmate's tablet.  [DN 93-2 at 5; DN 86-2 at 2].  With respect to the HRDC publications containing staples mailed to the facility directly, those items are now kept in the inmate's property for review by the inmate upon request. [Brady Aff. at ¶¶ 13–15, DN 64-4].

generally." *Turner*, 482 U.S. at 90.   "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id*.  HRDC offers an alternative to the present policy: the Detention Center staff remove staples from all publications and distribute the materials to the inmates to be housed in their cells, not property room.  [DN 68 at 2].  This proposal would produce the type of "ripple effect" that demands deference to facility officials. *Turner*, 482 U.S. at 90.   HRDC does not dispute that it takes the Detention Center staff considerable time and effort to remove staples from HRDC's publications *Prison Legal News* and *Criminal Legal News* without destroying the publications given the location and method of stapling.  [McElfresh Dep. at 101–102, DN 71-3; Hunt Aff., DN 15-2].   Requiring the Detention Center staff to remove all staples from all publications sent to its facility and permitting all publications to be housed in the inmate cells would adversely affect the allocation of prison staff resources and impose logistical and safety challenges upon the Detention Center.[4]  This factor also supports Defendants.

Finally, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Turner*, 482 U.S. at 90.  Or stated another way, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id*.  "But this factor does not require prison officials to pick the 'least restrictive alternative;' rather, evidence of an 'alternative that fully accommodates the [plaintiff's] rights [at] a *de minimis* cost to valid penological interests' can demonstrate that the regulation does

---

[4] Interestingly, in *Hum. Rts. Def. Ctr. v. Johnson Cnty., Kansas, Bd. of Commissioners*, 507 F. Supp. 3d 1277, 1283 (D. Kan. 2020), the Court noted that "[s]ince at least September 24, 2020, HRDC has sent copies of *Prison Legal News* in a manner that complies with both the sticker/label policy and the package pre-approval policy." *Id*. at 1283. The Court is a bit perplexed why HRDC has refused to comply with the Detention Center's new written mail policy as it has done with Johnson County Detention Center in Kansas.

not bear a reasonable relationship to the proffered justification." *Bethel v. Jenkins*, 988 F.3d 931, 941 (6th Cir. 2021) (quoting *Turner*, 482 U.S. at 90–91).  Thus, the question is whether HRDC can point to an alternative that fully accommodates its rights at a *de minimis* cost to valid penological interests of the Detention Center.

HRDC argues that Defendants' sole justification for prohibiting HRDC's magazines—staples used to bind each issue's pages—is an exaggerated response to a security concern that could be addressed by the Detention Center simply removing the staples.  [DN 68 at 2].  The Court disagrees.  As addressed above, removal of the staples by the Detention Center of the *Prison Legal News* and *Criminal Legal News* imposes more than a *de minimis* cost—diverting resources from deputy jailers' normal duties and responsibilities to handling inmate mail.  [Hunt Aff., DN 15-2; McElfresh Dep. at 100].

Balancing these *Turner* factors, the staple policy is "reasonably related to legitimate penological interests."  482 U.S. at 89.

*2. Books*

"'Prison policies regulating prisoner access to printed material frequently come under scrutiny.'" *Cooper v. Vincent*, No. 5:17-CV-10-TBR, 2019 WL 5580242, at *6 (W.D. Ky. Oct. 29, 2019) (quoting *Bethel*, 2019 WL 917122, *4).  "'Publisher only' rules, or policies that prohibit prisoners from receiving books unless the publisher sends them directly to the inmate, have been upheld by the Supreme Court." *Cooper*, 2019 WL 5580242, at *6 (citing *Bell*, 441 U.S. 520); *see also Ward v. Washtenaw Cnty. Sheriff's Dep't*, 881 F.2d 325, 329–30 (6th Cir. 1989) (extending *Bell* to a "publisher only" policy for soft cover materials); *Miles v. Scanlon*, No. 1:21-CV-74, 2021 WL 1809834, at *6 (W.D. Mich. May 6, 2021) ("The Sixth Circuit has repeatedly upheld the validity of the publisher-only rule.").  Likewise, the Sixth Circuit recently upheld a prison

regulation prohibiting orders for printed material placed by third parties and found that requiring inmates to order their own books bore rational connection to the prison's legitimate interest in preventing contraband from entering the prison and threatening security. *Bethel*, 988 F.3d 931.

In the present case, under the previous mail practice and the new written mail policy, the Detention Center requires preapproval of parcels (hereinafter "preapproval policy,") including packages containing books.  The preapproval of books and parcels does not violate HRDC's First Amendment rights.  It is actually less restrictive than the regulation upheld in *Bethel* discussed above.  First, a valid and rational connection exists between the Detention Center's mail practice and policy rejecting unapproved parcels and the legitimate, neutral governmental interests of jail safety and security.  Defendants produced evidence that parcels and books sent to inmates have posed a significant risk to jail security and safety because those items have been sprayed, soaked, or otherwise coated with illegal substances. [Brady Aff., DN 64-4].  These illegal substances may cause inmates to overdose or become violent.  [*Id.*].  In fact, in one instance, an inmate bit a correctional officer's shoulder, and in another instance, an inmate threw a correctional officer over a stairwell.  [*Id.*].  Thus, Defendants provided sufficient evidence demonstrating the connection between preapproval of parcels and books and the entry of contraband into the Detention Center. Additionally, the Detention Center's policy is neutrally applied because the policy prohibits all parcels and books that have not been preapproved, not just those of HRDC.  *Bethel*, 988 F.3d at 940.  Thus, Defendants satisfied the first *Turner* factor.

Second, "alternative means of exercising the right . . . remains open" to publishers.  *Turner*, 482 U.S. at 90.  Under both the former mail practice and the new written mail policy, publishers such as HRDC retain the right to send unsolicited books and other publications—they are merely required to seek preapproval before they send them.  [McElfresh Dep. at 66, DN 71-3; Hunt Dep.

at 18, DN 70-2]. Following implementation of its new written mail policy in September 2020, HRDC can now send its publications in digital format[5] for approval which will then be downloaded to the applicable inmate's account. [McElfresh Dep. at 158–159, DN 71-3; Hunt Dep. at 72, DN 70-2]. Alternatively, if physically delivered to the Detention Center, HRDC's books or other publications too large to scan are placed in the relevant prisoner's property bag. Upon request, inmates are taken to a private room in the Detention Center and allowed to view the documents in their property. [DN 64-4]; *see also* [Blackwell Dep. at 23, 83, DN 84; Benson Dep. at 9, 15, 16, 22, DN 83-1; Ervin Dep. at 9–10, DN 84-3; Johnson Dep. at 5–6, 28, DN 72; McGuire Dep. at 5–6, 9–10, 11, 22, 29, 38–40, DN 83-4]. If the book does not contain any staples or other contraband and has been preapproved, the inmate may at his request keep the book in his cell provided the inmate does not already possess five books or requests to exchange a book in his cell for one in his property bag. [Blackwell Dep. at 19, 27, DN 84]. These alternatives are or were readily available to HRDC, and as a result, the Court owes judicial deference to Defendants on this point. *Turner*, 482 U.S. at 90. Thus, the second factor of *Turner* supports Defendants. *Overton*, 539 U.S. at 136.

Third, allowing inmates to receive non-preapproved books would adversely affect prison resources and staff "who would be required to check individual pages of such books in order to determine whether it contained contraband." *Cooper*, 2019 WL 5580242, *6; *Turner*, 482 U.S. at 90. As discussed above, "[w]hen accommodation of an asserted right will have a significant 'ripple

---

[5] HRDC contends that it does not have ample alternatives to its current distribution methods because compliance with electronic or digital delivery is cost-prohibitive because it does not own rights to every book or publication. "The purported lack of economically feasible alternatives for [HRDC] is not a basis upon which to find [the policy] unconstitutional." *Courier-Journal., Inc. v. Louisville/Jefferson Cnty. Metro Gov't*, No. CIVA 3:09CV-449, 2009 WL 2982923, at *6 (W.D. Ky. Sept. 11, 2009) (citing T*he Pitt News v. Fisher*, 215 F.3d 354, 366 (3d Cir. 2000) ("The fact that *The Pitt News* is a newspaper does not give it a constitutional right to a certain level of profitability, or even to stay in business at all. *The Pitt News* 'proceeds on the erroneous premise that it has a constitutional right not only to speak, but to speak profitably.'")). Additionally, HRDC failed to articulate to which books or publications it does not own the electronic rights.

effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90. HRDC's alternative—permit all books received from publishers and book distributers to be distributed to the inmates for review in their cell [DN 68 at 21]—produces the type of "ripple effect" that demands deference to facility officials. *Turner*, 482 U.S. at 90. Removal of the preapproval process would grant inmates easier access to intoxicants and other illicit substances and/or to publications that could result in a safety hazard as discussed above. Furthermore, requiring Detention Center staff to inspect each parcel and each page of a publication or book sent to its facility and permitting all publications to be housed in the inmate cells would adversely affect the allocation of prison staff resources and impose logistical and safety challenges upon the Detention Center. Thus, the third *Turner* factor also supports the Defendants.

Finally, HRDC fails to suggest an alternative policy that "fully accommodates [its] rights at a *de minimis* cost to valid penological interests." *Id*. at 91. HRDC argues that the sole justification for prohibiting books that are not approved is an exaggerated response. HRDC further contends that because its books "are not subject to a preapproval requirement," the Detention Center should no longer "impound HRDC's publications" but should instead just allow the "intended recipient to have the HRDC publication in their cell if they indicate to Jail staff that they want to accept it." [DN 68 at 33–35]. Initially, HRDC books are subject to the preapproval requirement. If the Detention Center preapproves *Prisoner's Guerilla Handbook* and *Protecting Your Health and Safety: A Litigation Guide for Inmates*, those unsolicited books are placed in the inmate's property unless and until such time as the inmate requests the book and the inmate has fewer than five books in the cell. [DN 64-1 at 31; DN 93-2 at 5; DN 86-2 at 2]. As addressed above, permitting all books received from publishers and book distributors to be distributed to

inmates for review in their cell imposes more than a *de minimis* cost—diverting resources from deputy jailers' normal duties and responsibilities to handling inmate mail.  [Hunt Aff., DN 15-2; McElfresh Dep. at 100, DN 71-3].

Additionally, HRDC now complains that "to date, Defendants have not allowed a single incarcerated person at the Jail to possess in his or her housing area a physical copy of any HRDC mailing . . . . "  [DN 68 at 1].  HRDC cites no case law to support its argument that HRDC has a constitutional right to have inmates review its publications in their cells rather than outside of the inmate's cell in a supervised area.  In fact, HRDC provides no evidence that any inmate has requested to possess in his cell a *preapproved* HRDC book.  Similarly, to the extent that every inmate does not have his or her own personal jail tablets, HRDC fails to cite any law to support its theory that its First Amendment rights are violated if an inmate cannot have constant access to HRDC's publications.  Accordingly, the fourth *Turner* factor weighs in favor of Defendants.

Balancing these *Turner* factors, the preapproval policy is "reasonably related to legitimate penological interests,"  482 U.S. at 89, and the Defendants are entitled to summary judgment as to Plaintiff's First Amendment claim regarding this material.

### 3.  Ten Follow-Up Letters

The record reflects that on July 8, 2020, Paul Wright from HRDC sent letters to each of the ten incarcerated persons asking if they had received the items mailed to them on June 19, 2020. [Wright Decl. ¶ 22; DN 69].  The letter informed the inmate that he would be receiving a free subscription of *Prison Legal News* and *Criminal Legal News*.  The letter also contained a self-addressed, stamped envelope that the inmate could use to respond.  The letter did not contain staples or contraband.  On July 27, 2020, the Detention Center directed the Postal Service to return

all ten[6] letters to HRDC.  [*Id.* at ¶¶ 22, 25].  Jailer Brady testified that the ten follow-up letters were returned to HRDC mistakenly with staff believing "that the information contained in the envelopes were available in the law library on the inmate's tablets."  [Brady Aff. at ¶¶ 20-21, DN 64-4].

Defendants argue that even if these letters were constitutionally protected, Defendants' return of these letters under a mistaken belief is not a constitutional violation.  HRDC does not address this argument.  Allegations of negligence do not state a claim under § 1983.  *See Daniels v. Williams*, 474 U.S. 327 (1986); *Sims v. Landrum*, 170 F. App'x 954, 957 (6th Cir. 2006).  At most HRDC's claim demonstrates that these ten letters were negligently returned to HRDC by an unspecified member of the Detention Center staff.  *See Jones v. Salt Lake Cnty.*, 503 F.3d 1147, 1162–63 (10th Cir. 2007) ("The fact certain editions of *Prison Legal News* were not delivered to Thomas and other inmates was the result of human error [by prison staff] . . . .  Such negligence does not state a § 1983 claim. . . . Liability under § 1983 must be predicated upon a *deliberate* deprivation of constitutional rights by the defendant, and not on negligence") (citation omitted, emphasis in original); *Hum. Rts. Def. Ctr. v. Winn*, 431 F. Supp. 3d 925, 939–940 (E.D. Mich. 2020) ("[t]he 60 times HRDC allegedly did not receive notice of the rejection can be considered negligence on the part of prison officials and not an intentional deprivation of HRDC's due process rights"); *Ybanez v. Scott*, No. 14-CV-01059, 2015 WL 1258290, at *5 (D. Colo. Mar. 17, 2015); *Wilson v. United States*, 332 F.R.D. 505, 525 (S.D. W. Va. 2019) ("'[i]solated or inadvertent incidents of lost mail, mail tampering, or the mishandling of mail are not actionable under § 1983'")(citation omitted); *Woodward v. City of Worland*, 977 F.2d 1392, 1399 (10th Cir. 1992)

---

[6] In some pleadings and declarations, HRDC represents that eight follow-up letters were censored.  *See, e.g.*, [Wright Decl. ¶¶ 35, 42, DN 69].  Additionally, Japaris Baker testified that he reviewed the July 8, 2020, letter from Wright prior to its return.  [Baker Dep. at 28, DN 83-2].

("The Supreme Court has made it clear that liability under § 1983 must be predicated upon a 'deliberate' deprivation of constitutional rights by the defendant. . . . It cannot be predicated upon negligence.") (citations omitted).

For these reasons, HRDC's First Amendment claim fails as to the ten follow-up letters as well.

## B. Due Process Violation

HRDC argues that the Due Process Clause of the Fourteenth Amendment requires a correctional institution to provide the sender of rejected mail with notice for each piece of rejected mail and an opportunity to appeal the decision, which it claims that the Detention Center did not do. HRDC maintains that the Detention Center violated its procedural due process right as defined by *Procunier v. Martinez*, 416 U.S. 396, 418–19 (1974), entitling it to notice of *all* rejected mailings and an opportunity to appeal the Detention Center's rejection of its materials and publications.

Defendants maintain that HRDC does not have due process rights with respect to its mailings. *Thompson v. Campbell*, 81 F. App'x 563, 570 (6th Cir. 2003) (inmate has no property or liberty interest in receipt of non-subscription "standard rate mail," making a distinction as to mail for which the prisoner has paid in advance to receive) ("[w]ithout deprivation of a protected interest, he has no due process claim separate from his First Amendment claim, which we have already rejected"); *see also Osterback v. Crosby*, No. 4:01CV76, 2004 WL 964139, at *5 (M.D. Fla. Mar. 25, 2004). Alternatively, Defendants argue that even if HRDC possesses a liberty interest in its mailings, it received sufficient due process pursuant to the standard articulated in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); s*ee also Perry v. Florida Department of Corrections*, 664 F.3d 1359, 1368 (11th Cir. 2011).

The Fourteenth Amendment's Due Process Clause forbids States from "depriv[ing] any person of life, liberty, or property[ ] without due process of law." U.S. Const. amend. XIV, § 1. When considering whether a challenged state action violates procedural due process, the Court first considers whether there is a protected property or liberty interest. *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 389 (6th Cir. 2020) (citing *Johnson v. Morales*, 946 F.3d 911, 922 (6th Cir. 2020)). If there is a protected interest, the Court considers "what process is due." *Id*.; *see also Kaplan v. University of Louisville*, 10 F.4th 569, 577 (6th Cir. 2021); *Bethel*, 988 F.3d at 942.

First, the Court will assume for purposes of this motion that HRDC had a protected interest in sending unsolicited mail to inmates at the Detention Center.

Second, having concluded a protected interest exists for purposes of this motion, the second step in resolving HRDC's due process claim is to determine what procedural requirements apply. "[T]he required procedural protections depend on the interest at issue–the nature of the mail withheld–and the correctional justification for withholding the mail without notice." *Daniels v. Cleaver*, No. 2:18-CV-00285, 2020 WL 2044621, at *4 (D. Or. Apr. 27, 2020) (citing *Mathews*, 424 U.S. at 335; *Procunier*, 416 U.S. at 408 n. 11 (recognizing that "[d]ifferent considerations may come into play in the case of mass mailings" as opposed to personal correspondence)). "Courts differ over the level of due process that is owed to a publisher when its mailings to inmates are rejected by a correctional facility based on a rule of general application ([for example], a rule prohibiting all magazines), rather than on censorship due to content or the status of the sender." *Hum. Rts. Def. Ctr. v. Sherburne Cnty., Minnesota*, No. CV 20-1817, 2020 WL 7027840, at *6 (D. Minn. Nov. 30, 2020) (citing *Hum. Rts. Def. Ctr. v. Baxter Cnty., Arkansas*, 360 F. Supp. 3d 870, 877–82 (W.D. Ark. 2019) (discussing differing standards applied by courts)). The parties have

not cited, and this Court has not found, a Sixth Circuit case addressing the level of process that is due a *publisher* in this exact circumstance—where a detention center rejects unsolicited books and publications sent to inmates from a publisher.

Under the *Procunier v. Martinez* test (hereinafter the "*Procunier* test") advocated by HRDC, "due process requires that the following safeguards be provided each time an item of mail is intercepted by prison officials: (1) the inmate must be notified; (2) the sender must be given a reasonable opportunity to protest the decision; and (3) any complaints must be referred to a prison official other than the person who originally disapproved the correspondence." *Prison Legal News v. Crews*, No. 4:12CV239, 2014 WL 11411829, at *20 (N.D. Fla. Aug. 11, 2014) (citing *Procunier*, 416 U.S. at 418–19); *see also Martin v. Kelley*, 803 F.2d 236, 243–44 (6th Cir. 1986) (censorship of a letter written on KKK letterhead).

To evaluate a due process claim under the *Mathews v. Eldridge* test (hereinafter the "*Mathews* test") advocated by Defendants, a court should consider: "(1) 'the private interest that will be affected by the official action;' (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;' and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *Conyers v. Garrett*, No. 22-11152, 2022 WL 1913598, at *8 (E.D. Mich. June 3, 2022) (citing *Mathews*, 424 U.S. at 335).

After a review of the relevant case law, the Court agrees with the district court and Eighth Circuit in *Hum. Rts. Def. Ctr. v. Baxter Cnty. Arkansas*, 999 F.3d 1160, 1167 (8th Cir. 2021) and concludes that HRDC's due process claims should be assessed under *Mathews*, "rather than the more stringent standards of *Procunier*, a censorship case." *Baxter Cnty.*, 999 F.3d at 1167. *But*

*see Prison Legal News v. Chapman*, 44 F. Supp. 3d 1289, 1303–04 (M.D. Ga. 2014). "'[A]ltogether different considerations come into play when a publication is rejected not because it was censored based on its content or the status of the sender but rather because it was a mass mailing rejected pursuant to the routine enforcement of a rule with general applicability.'" *Baxter Cnty.*, 999 F.3d at 1167 (citation omitted). "[G]enerally applicable, neutral policies [are] not likely subject to the same due-process requirements." *Johnson Cnty.*, 507 F. Supp. 3d at 1288; *see also Prison Legal News v. Livingston*, 683 F.3d 201, 223 (5th Cir. 2012) (noting that subsequent denials of publications previously deemed improper "amount to the routine enforcement of a rule with general applicability" that "are non-individualized" and thus "it is not even clear that due process is implicated by such decisions"); *Hum. Rts. Def. Ctr. v. Union Cnty., Arkansas*, No. 1:17-CV-1064, 2022 WL 4240897, at *1 (W.D. Ark. Sept. 14, 2022) (describing the Eighth Circuit's affirmance in *Baxter* as holding "that Plaintiff's eventual knowledge of the reason for refused mailing was sufficient to put Plaintiff on notice that further non-postcard mailings would also be rejected"). This finding is also consistent with the Sixth Circuit's application of the *Mathews* test in assessing an inmate's claim against a warden and mail room supervisor that a prison regulation prohibiting third-party book orders from unapproved vendors violated his due process rights. *Bethel*, 988 F.3d at 944.

In the present case, HRDC mailed ten inmates batches of "outreach" materials as discussed in more detail above. The Detention Center rejected these materials: specifically, a "routine rejection of mail" under a staple policy and a package preapproval policy "because [the mail] did not comply with a generally applicable, content-neutral policy that applies to all types of mailings, regardless of content and regardless of sender." *Johnson Cnty*, 507 F. Supp. 3d at 1287. "[T]his

28

case is much closer to the cases dealing with 'mass mail' than it is to the cases HRDC cites involving censorship." *Baxter Cnty.*, 360 F. Supp. 3d at 882.

Under the *Mathews* test, HRDC has a private interest in communicating with prisoners "to spread its message and try to disseminate more of its publications." *Baxter Cnty*, 360 F. Supp. 3d at 882. Even so, under the former mail practice, the Detention Center's rejection of HRDC's unsolicited publications and books because of staples and parcel preapproval does not completely deprive HRDC of the opportunity to communicate with prisoners as discussed more fully above in addressing HRDC's First Amendment claim—HRDC could send unsolicited books after obtaining preapproval or send other publications after removing staples. Additionally, under its new written mail policy, HRDC can now send its publications in digital format for approval which will then be downloaded to the applicable inmate's account. All of these avenues remain open to HRDC. Finally, "creation of a formal appeal process to challenge the rejection of a mailing because it does not comport" with the staple policy or parcel preapproval policy is "unwarranted." *Id*. A detention center and/or county must be free "'to pass rules of general application, even ones that limit prisoner rights, without subjecting such rules to repetitive challenges every time they are applied.'" *Id*. at 883 (quoting *Livingston*, 683 F.3d at 223)). Applying the *Mathews* test to this case, HRDC was "entitled to notice that its mailings were rejected . . .," but not an "opportunity to appeal the rejection" as it advocates. *Johnson Cnty*, 507 F. Supp. 3d at 1288; *Baxter Cnty*, 999 F.3d at 1167.

Accordingly, the question is whether HRDC received sufficient notice under the circumstances presented. Despite the fact that HRDC contends it was not given any notice that its mail was rejected, it concedes that the actual publications, books, and mail were returned to it with various stamps, including "return to sender per mail policy" and "return to sender: refused: unable

to forward." This notice sufficiently placed HRDC on notice that its mail was not delivered, with most of the mail returned "per mail policy." "'Due Process is not a technical conception with a fixed content unrelated to time, place, and circumstances; instead, it is flexible and calls for such procedural protections as the particular situation demands.'" *Van Den Bosch v. Raemisch*, No. 09-CV-62, 2009 WL 4663134, at *4 (W.D. Wis. Dec. 1, 2009) (quoting *Clancy v. Office of Foreign Assets Control of U.S. Dept. of Treasury*, 559 F.3d 595, 600 (7th Cir. 2009) (internal quotations and alterations omitted)). In this case, HRDC had all the information it needed to challenge the decision, if that is what it wanted to do. *Van Den Bosch*, 2009 WL 4663134, at *4. As noted in *Baxter*, when the first mailings were returned to HRDC in July 2020, "a simple phone call to the Jail would have confirmed" the detailed reasons for the publications and packages refusals. *Baxter Cnty.*, 999 F.3d at 1167. Furthermore, HRDC could have contacted the Detention Center via letter challenging its return of the items in question. HRDC did not avail itself of this mechanism. Based on this information, the Court concludes that Defendants satisfied the due process requirements by providing HRDC with notice that its mailings were being rejected and HRDC could have sufficiently determined the detailed reasons for the returned mail.

With respect to the new written mail policy, the Detention Center has since changed its notification procedure providing that that both the inmate and sender shall be provided with written notification if mail is withheld or rejected including the reason for the rejection and the appeal process. [DN 86-2 at 7].

For these reasons, the Court finds that HRDC's due process claim fails.

**C. Qualified Immunity**

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity claims are analyzed under a two-prong test: (1) whether '[t]aken in the light most favorable to the party asserting the injury, [ ] the facts alleged show the officer's conduct violated a constitutional right,' and (2) 'whether the right was clearly established . . . in light of the specific context of the case.'" *Bethel*, 988 F.3d at 944–45 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). To be clearly established, "'a legal principle must have a sufficiently clear foundation in then-existing precedent.'" *Moderwell v. Cuyahoga Cnty., Ohio*, 997 F.3d 653, 660 (6th Cir. 2021) (quoting *District of Columbia v. Wesby*, —— U.S. ——, 138 S. Ct. 577, 589 (2018)). There does not need to be "'a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Moderwell*, 997 F.3d at 660 (quoting *Ashcroft*, 563 U.S. at 741).

Because the Court finds that there was no violation of HRDC's First Amendment or Fourteenth Amendment procedural due process rights, Jailer Brady and Mail Clerk Hunt are entitled to qualified immunity as a matter of law. Even if there was a violation of a constitutional right, HRDC cannot show that a publisher's right to send unsolicited books and publications withheld pursuant to a staple policy and a preapproval policy was clearly established. *See Bethel*, 988 F.3d at 945. Additionally, given the conflicting case law discussed above, the Court has not "found a consensus position as to whether and how much process is due before a jail or prison may reject incoming unsolicited publications based on content-neutral, generally applicable regulations." *Union Cnty.*, 2018 WL 1832973, *4.

Accordingly, the Court finds Jailer Brady and Mail Clerk Hunt are entitled to qualified immunity in regard to HRDC's First and Fourteenth Amendment individual capacity claims as

well.  HRDC's individual capacity damage claims asserted against Jailer Brady and Mail Clerk Hunt for alleged First and Fourteenth Amendment violations are dismissed.

**D.  Declaratory and Injunctive Relief**

HRDC sues for declaratory and injunctive relief in addition to compensatory relief.  The federal courts have the power to adjudicate "Cases" and "Controversies."  U.S. CONST. art. III, §2.  This limitation on federal courts requires that a claim not become moot.  *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019).  "A case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  *Id.*  (cleaned up)  Although the burden on Defendants to show mootness is a "heavy one," *id.*, it is "lower when it is the government that has voluntarily ceased its conduct."  *Id.*  Accordingly, the government's self-correction "provides a secure foundation for a dismissal based on mootness so long as it appears genuine."  *Id.*

Defendants began the process of changing the Detention Center's mail policy and moving to electronic delivery of mail months before HRDC sued.  [DN 15 at 12–13].  Under the Detention Center's new written mail policy, all mail is scanned into inmates' accounts, who can read the mail by utilizing tablets in inmates' cells.  [DN 93-2; DN 86-2].  As such, HRDC and other publishers can now send *a digital copy* of any of its publications to the Detention Center for preapproval, which will be downloaded to the inmate's account for easy digital access.  [DN 93-2 at 5; DN 86-2 at 2].  The record reflects that the Detention Center implemented the new mail policy in September of 2020, and HRDC was informed of this policy change in November of 2020, approximately six weeks after filing this suit.  At that time, the Detention Center offered to allow HRDC to disseminate its publications and mailing to inmates in an electronic format so that the

publications could be viewed on the tablets.  HRDC has declined such offer.  [McElfresh Dep. at 158–59, DN 71-3; Hunt Dep. at 72, DN 72-4].

Additionally, after the new written mail policy was voluntarily enacted by the Detention Center, it began placing *all HRDC* publication materials sent directly to the Detention Center into the inmates' property bags located in the property room, including non-preapproved books, publications that contain staples, or publications too large to be scanned into the tablet.  [DN 64-1 at 31; DN 93-2 at 5; DN 86-2 at 2].  To access these materials, an inmate only needed to request it via a simple form.  *Id.*  Based on their depositions, most inmates were aware of this mechanism for accessing mailed publications.  *See* [Blackwell Dep. at 23, 83, DN 84; Benson Dep. at 9, 15, 16, 22, DN 84-3; Ervin Dep. at 9–10, DN 84-3; Johnson Dep. at 5–6, 28, DN 72; McGuire Dep. at 5–6, 9–10, 11, 22, 29, 38–40, DN 83-4].  When inmates do this, they are allowed to read HRDC's materials in a separate area from other inmates.  *Id.*  HRDC argues that this alternative of viewing the materials tangibly and separately is insufficient and ripe for misconduct and subversion; however, under the new written mail policy the main avenue for prisoners to view these materials still remains through their tablets.  Of the eight inmates' depositions, six inmates received HRDC letters and other information scanned to their tablet accounts following the policy change.  *See, e.g.,* [Blackwell Dep. at 23, 83, DN 84; Baker Dep. at 28, DN 83-2; Benson Dep. at 23, DN 83-1; List of HRDC items scanned to inmate's tablet accounts, DN 71-2].  HRDC's refusal to comply with the new written mail policy does not mean that the policy is unconstitutional or that HRDC is entitled to injunctive relief.

Additionally, the Detention Center has since contracted out the scanning of mail to a third-party vendor, to whom all persons are directed to send mail or digital files via the detention center's website and mail policy.  [DN 93-2 at 5; DN 86-2 at 2].  The evidence of a third-party vendor

further supports the presumption that the Detention Center's switch in policy is a genuine one. HRDC now argues that Defendants do not adequately supervise the Detention Center's mail scanning vendor to whom it has delegated the duty of handling mail.  [DN 68 at 37–38; DN 95 at 12].  HRDC's challenge to the supervision of the mail vendor is a non-starter given the new written mail policy requires submission of publications and magazines in digital format.  Additionally, HRDC's publications which still contain staples and are still physically sent to the Detention Center are placed in the inmate's property and can be viewed at the inmate's request.

Finally, with respect to the due process claim, the new written mail policy provides that if mail or publications are rejected "the inmate and sender shall be promptly notified in writing" including "the specific reason for any rejection and the appeal process" satisfying any alleged constitutional due process violation raised by HRDC.  [DN 93-2 at 10–11].

Accordingly, there is no reasonable expectation that Defendants' conduct that allegedly violated the First and Fourteenth Amendment will occur again.  In short, because Defendants have voluntarily ceased its alleged unconstitutional conduct, HRDC's Motion for Preliminary Injunction is moot.  *See Hanrahan v. Mohr*, 905 F.3d 947, 962 (6th Cir. 2018) ("Moreover, we have previously found cases seeking declaratory and injunctive relief moot after prisons have changed policies that were challenged in litigation."); *see also Jaami v. Compton*, 248 F.3d 1149 (6th Cir. 2000) ("This change in the prison policy renders Jaami's requests for declaratory and injunctive relief moot because no need exists for this court to issue an injunction when prison authorities have voluntarily changed the allegedly unconstitutional practice.").  Defendants are granted summary judgment on this claim.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Plaintiff's Human Rights Defense Center's motion for summary judgment [DN 68] is **DENIED** and Defendants Henderson County, Kentucky, Amy Brady, and Lironda Hunt's motion for summary judgment [DN 64] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' motion for leave to exceed page limitations [DN 94] is **GRANTED**.

*Joseph H. McKinley*

Joseph H. McKinley Jr., Senior Judge
United States District Court

cc: counsel of record

October 25, 2022